IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RITE AID CORPORATION,               :
                                    :        CIVIL ACTION NO. 1:CV-03-1801
                    Plaintiff       :
                                    :        (Judge Kane)
            v.                      :
                                    :
                                    :
LIBERTY MUTUAL FIRE        :
INSURANCE CO., et al.,              :
                                    :
                    Defendants      :

## MEMORANDUM AND ORDER

Before the Court are cross motions for summary judgment.  (Doc. Nos. 70 and 73.)  The

motions have been fully briefed and are ripe for disposition.  For the reasons that follow, Plaintiff's

motion for summary judgment will be granted in part and denied in part, and Defendant's motion for

summary judgment will be granted in part and denied in part.

## I.      Background[1]

This insurance dispute originated from a February 9, 2001 Demand for Arbitration filed by Beth

Kaplan ("Kaplan"), a former executive officer of Plaintiff Rite Aid Corporation, asserting numerous

claims against Plaintiff.  In August 1996, Ms. Kaplan left her Vice President position with Proctor &

Gamble to become a senior executive in charge of Plaintiff's Cosmetics and Fragrance Division.

According to Kaplan, her decision to sign an employment contract with Plaintiff was based in part on

information found within Plaintiff's public disclosures, annual reports, and SEC filings.  After two and a

_____

[1] The following information is taken from the parties' statements of material undisputed facts.
(Docs. No. 71, 75, 85, 88.)

half years, Plaintiff became embroiled in stockholder lawsuits and regulatory investigations regarding

certain financial practices conducted by Plaintiff's management.  These financial irregularities resulted in

a $1.6 billion correction to prior years' earnings, dramatic reduction in Plaintiff's stock price, and

criminal prosecution of members of Plaintiff's management.  On November 12, 1999, Kaplan

terminated her employment agreement with Plaintiff and resigned from the company.

In her Demand for Arbitration, Kaplan alleged, inter alia, that Plaintiff had negligently or

intentionally misrepresented its financial strength in documents given to her prior to her employment,

thereby fraudulently or negligently inducing her to take employment with a company financially weaker

than advertised.  Kaplan also alleged that the taint of association with Plaintiff handicapped her ability to

secure employment commensurate with her experience.

Defendant Liberty Mutual issued a Commercial General Liability policy to Plaintiff for years

1997, 1998, and 1999 ("Policy").  During all times relevant hereto, Plaintiff was also covered by an

Employment Practices Liability Insurance policy issued by Zurich American Insurance ("Zurich").  By

letter dated July 6, 2001, Plaintiff notified Zurich of the arbitration.  By letter dated August 27, 2001,

Plaintiff notified Defendant of the arbitration with Kaplan.

On November 14, 2002, an arbitration panel issued a ruling awarding Kaplan nearly

$5,000,000, plus interest, in damages, but finding for Plaintiff on Kaplan's claims for pre-employment

misrepresentations and injury to reputation.  On January 22, 2003, Plaintiff and Kaplan entered a

confidential settlement agreement.

## II.  <u>Procedural History</u>

On September 26, 2003, Defendant commenced an action in the United States District Court

for the Northern District of California, seeking declaratory judgment with respect to potential liability

under the Policy.  On October 8, 2003, Plaintiff initiated the instant action against Defendant, Zurich,

and Federal Insurance Company ("Federal Insurance"), asserting breach of contract and bad faith

under the Pennsylvania Bad Faith statute, 42 Pa. Cons. Stat. Ann. § 8371.  In addition, Plaintiff moved

to transfer the California action to this Court, or in the alternative, dismiss the action.  On December 18,

2003, the California court transferred Defendant's declaratory judgment action to this Court,

whereupon this Court dismissed the case as unnecessarily duplicative to the instant litigation.

On February 11, 2004, Plaintiff filed an amended complaint.  (Doc. No. 29.)  On February 15,

2005, Plaintiff filed its instant motion for summary judgment.  (Doc. No. 70.)  On February 18, 2005,

Defendant filed its motion for summary judgment.  (Doc. No. 73.)  On February 18, 2005 and March

18, 2005, Plaintiff voluntarily dismissed Zurich and Federal Insurance respectively from this case.

## III.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56;

White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  A factual dispute is material if it

might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  A factual dispute is genuine only if there is a sufficient evidentiary basis that

would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id. at 249.  The

evidence presented must be viewed in the light most favorable to the non-moving party.  Id.  "The

inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or

whether it is so one sided that one party must, as a matter of law, prevail over the other." Id.  This

standard does not change by virtue of cross-motions being presented.  United States v. Hall, 730 F.

Supp. 646, 648 (M.D. Pa. 1990).

The moving party has the initial burden of identifying evidence that it believes shows an absence

of a genuine issue of material fact.  Childers v. Joseph, 842 F.2d 689, 694 (3d Cir. 1988).  Once the

moving party has shown that there is an absence of evidence to support the non-moving party's claims,

the non-moving party may not simply sit back and rest on the allegations in the complaint.  Instead, the

non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

answers to interrogatories, and admissions on file, designate specific facts showing that there is a

genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The evidence must be

viewed in the light most favorable to the non-movant. See Groman v. Township of Manalapan, 47 F.3d

628, 633 (3d Cir. 1995).  Summary judgment should be granted where a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's case and on which

that party will bear the burden at trial." Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a court

should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory or

speculative.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  There must be more

than a scintilla of evidence supporting the nonmoving part and more than some metaphysical doubt as to

the material facts.  Id. at 252; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986).

## IV.  **Discussion**

4

### A.      INTERPRETATION OF THE INSURANCE POLICY

Both parties agree that Pennsylvania law governs this contractual dispute.  (Doc. No. 72 at 10,

n.8; Doc. No. 74 at 6.)  It is well-settled that the task of interpreting an insurance contract falls to the

Court.  Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983).  An

insurer owes a duty to defend under a policy when "the allegations in the complaint against [the insured]

could potentially fall within the coverage of the policy."  Air Prods. & Chems. v. Hartford Accident &

Indem. Co., 25 F.3d 177, 179 (3d Cir. 1994) (citing Gedeon v. State Farm Mut. Auto. Ins. Co., 188

A.2d 320 (Pa. 1963)).  This obligation to defend arises whenever the underlying complaint potentially

may come within the coverage of the policy.  Humphreys v. Niagara Fire Ins. Co., 590 A.2d 1267,

1271 (Pa. Super. 1991).  Under Pennsylvania law, "it is not the actual details of the injury, but the

nature of the claim which determines whether the insurer is required to defend."  Springfield Twp. v.

Indemnity Ins. Co. of N. Am., 64 A.2d 761, 763 (Pa. 1949).  In determining whether an insurer has a

duty to defend its insured "the factual allegations of the complaint are taken to be true and the complaint

is to be liberally construed with all doubts as to whether the claims may fall within the coverage of the

policy to be resolved in favor of the insured."  Unionamerica Ins. Co., Ltd. v. J.B. Johnson, 806 A.2d

431, 433-34 (Pa. Super. Ct. 2002) (internal citations omitted).  See also Mark I Restoration SVC v.

Assurance Co. of Am., 248 F. Supp. 2d 397, 400 (E.D. Pa. 2003).

In interpreting the insurance policy, the Court should seek to ascertain the intent of the parties

as manifested by the language of the written instrument.  Standard Venetian Blind Co., 469 A.2d at

566-67.  When the language is clear and unambiguous, the Court is required to give effect to that

language.  Id..  "In construing an insurance policy, unambiguous terms are to be given their 'plain and

5

ordinary meaning.'" St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991)

(quoting Pennsylvania Mfrs. Ass'n Ins. Co. v. Aetna Casualty & Sur. Ins. Co., 233 A.2d 548, 551

(Pa. 1967)).  However, "if the policy provision is reasonably susceptible to more than one

interpretation, it is ambiguous."  McMillan v. State Mut. Life Assurance Co., 922 F.2d 1073, 1075 (3d

Cir. 1990).  "In determining whether a contract is ambiguous, the court must examine the questionable

term or language in the context of the entire policy and decide whether the contract is reasonably

susceptible of different constructions and capable of being understood in more than one sense."

Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997) (citing Gamble Farm Inn, Inc. v.

Selective Ins. Co., 656 A.2d 142 (Pa. Super. 1995)).

### 1.      Personal Injury

The policy at issue provides that:

> [Defendant] will pay those sums the insured becomes legally obligated
> to pay as damages because of "personal injury" or "advertising injury"
> to which this insurance applies.  [Defendant] will have the right and duty
> to defend [Plaintiff] against any "suit" seeking those damages.
> However, [Defendant] will have no duty to defend [Plaintiff] against any
> "suit" seeking damages for "personal injury" or "advertising injury" to
> which this insurance does not apply.[2]

(Liberty Mutual CGL Policy for Policy Year 1999, Doc. No. 78, Exhibit 4, § I(B)(1)(a).)  The

Policy defines "Personal injury" as meaning:

> a.       "Bodily injury";

---

[2] The policy originally distinguished between what it defined as "Bodily injury" and "Personal injury."  However, a general amendatory endorsement in effect at all times relevant hereto, amended the policy so that "Personal injury" was defined to include, inter alia, "Bodily injury" and replaced the former term throughout all relevant portions of the policy.  (Doc. No. 78, Exhibit 4.)

      b.      Injury to the feelings or reputation of a natural person, except for injury within the definitions of "bodily injury" or "property damage"; and

      c.      Injury to intangible property sustained by an organization as the result of a "covered offense".

(Liberty Mutual CGL Policy for Policy Year 1999, Doc. No. 78, Exhibit 4, General Amendatory Endorsement at 2.)  In her demand for arbitration, Kaplan asserted, inter alia, that Plaintiff "made false and misleading representations to Kaplan, including, without limitation, representations as to its financial health in its public filings, and direct representations to her such as the representation that Rite Aid was the most profitable drug store in the industry" before she was hired.  (Doc. No. 70, Exhibit 1, ¶¶ 78 and 86.)  Kaplan further asserted that Plaintiff made these representations "through its senior officers with the intention and expectation that Kaplan [would] rely on them in making her decision to accept employment with Rite Aid," causing her "severe injury to her career and income potential."  (Id., ¶¶ 80-91.)  In her demand, Kaplan explained that, allegedly, "as one of America's most promising and successful young executives . . . her status [is now] tainted through the guilt-by-association that accompanies prior service at a company engaged in the management and accounting practices with which the Rite Aid name is now associated in the executive employment marketplace."  (Id., ¶ 4.)  These claims for injury to reputation fall squarely within the policy's definition of "personal injury." (Doc. No. 78, Exhibit 4, Amendment page 2 of 13.)

      **2.**      **The Employment-Related Practices Exclusion**

Defendant argues that the policy does not cover Kaplan's claim of damage to her personal reputation because her claims fall within the policy's employment-related practices exclusion.  (Doc. No. 74 at 6-9.)  The Employment-Related Practices exclusion states that the insurance policy does not apply to:

> "Personal injury" to:
>
> 1. A person arising out of any:
>
>> (a)    Refusal to employ that person;
>>
>> (b)    Termination of that person's employment; or
>>
>> (c)    Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;
>
> * * *
>
> This exclusion applies:
>
>> 1.    Whether the insured may be liable as an employer or in any other capacity; and
>>
>> 2.    To any obligation to share damages with or repay someone else who must pay damages because of the injury.

(Employment-Related Practices Exclusion, Doc. No. 70, Exhibit 11.)  Defendant contends that the exclusion applies to Kaplan's personal reputation claim because Kaplan's alleged injury arose from incorrect financial statements used by Plaintiff to fraudulently induce Kaplan into entering employment with Plaintiff.  (Doc. No. 74 at 7-8.)  Although these actions occurred prior to Kaplan's actual employment, Defendant would have the Court broadly interpret the phrase "employment-related

practices, policies, acts or omissions" as encompassing the above alleged fraudulent inducement.  (Id. at 8-9.)  According to Defendant, Plaintiff's misrepresentations of its financial strength, to the extent that they were used to induce Kaplan into accepting employment, constituted "wrongful employment acts" that would fall within the aforementioned exclusion.  (Id. at 8.)

      This matter is one of first impression for this Court, as no Pennsylvania court has yet decided in a published opinion whether an employer's conduct prior to employment can constitute "employment-related practices, policies, acts or omissions."  (Doc. No. 70, Exhibit 11.)  The Court looks first to the language of the policy itself.  When construing the language of a contract, a court should give meaning to all its words and phrases and adopt a construction that avoids surplusage. Tenos v State Farm Ins. Co., 716 A.2d 626, 631 (Pa. Super Ct. 1998) "([Pennsylvania law] does not permit words in a contract to be treated as surplusage").  The exclusion at issue consists of three parts; claims arising out of (1) refusal to employ, (2) termination of employment, or (3) employment-related practices, policies, acts or omissions.  (Doc. No. 70, Exhibit 11.)  The first provision deals with a specific act prior to employment and the second provision concerns a specific act at the very end of employment.  If the "employment-related practices" phrase of the third provision was to be read as broadly as Defendants argue it should, then the third provision would naturally encompass the first two, making these prior provisions superfluous.  The policy's separation of these provisions indicates that the "employment-related practices" language of the third provision was not intended to encompass all acts that are tenuously associated with employment.  The Court's interpretation is bolstered by the types of acts actually listed in the third provision, such as demotion and reassignment, which would either typically or exclusively occur during the employment tenure, not prior to employment.  Rather, the

exclusion distinguishes prior employment acts from provision three by addressing such acts separately. This separate provision clearly defines what prior employment acts are covered under the exclusion; viz. refusals to employ.  (Doc. No. 70, Exhibit 11.)  Had Defendant intended to include the act of fraudulent inducement within the third provision or within the exclusion generally, it could have drafted the policy to do so.  Because it did not, Kaplan's claims for injury to her reputation are not excluded from the Policy by the Employment-Related Practices Exclusion.

### 3.    Other Insurance

Under the terms of the Policy, "[t]his insurance is primary except when [section] b. below applies."  (Doc. No. 78, Exhibit 4, § IV(4)(a).)  Subsection b applies exclusively to insurance for "fire, extended coverage, builder's risk, installation risk or similar coverage to 'your work' . . . fire insurance for premises rented to you . . . and loss aris[ing] out of the maintenance or use of aircraft, 'autos' or watercraft . . . ."  (Id., § IV(4)(b).)  As the instant matter does not fall within subsection b's listed exceptions, the Policy is a primary insurance policy.

In the event that two primary policies are triggered, "[t]hen [Defendant] will share with all that other insurance [sic]," contributing in equal shares, "until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first."  (Id., § IV(4)(a-c).)  However, under the General Amendatory Endorsement, the Policy:

> does not apply to any portion of a loss for which the insured has available any other valid and collectable insurance, whether primary, excess, contingent, or on any other basis, unless such other insurance was specifically purchased by the insured to apply in excess of this policy.

(Id., General Amendatory Endorsement, § N(1).)

The Zurich policy was also intended to be the primary insurance policy with regard to covered claims.  (Doc. No 78, Exhibit 5.)  Under the Zurich policy, Plaintiff had a "self-insured retention" and was "self-insured" up to the first million dollars in cost of defense.  (Id.)

In the present action, Plaintiff seeks to recover approximately $1.6 million from Defendant incurred in defending the Kaplan claims, plus pre-judgment and post-judgment interest.  (Doc. No. 122.)  Plaintiff asserts that Defendant is responsible for the first million dollars of Plaintiff's costs of defense, plus one half of the costs in excess of $1 million, which is equal to $1,559,925.  (Id.)  Defendant asserts that because Plaintiff's cost of defense was covered by the Zurich policy, it has no duty to defend whatsoever.  (Doc. No. 104 at 14.)

Under Pennsylvania law, an insurer's "duty to defend is broader than the duty to indemnify, because a duty to defend arises whenever an underlying complaint may potentially come within the insurance coverage. . . . If a single allegation of a complaint is potentially covered by a policy, an insurer has an obligation to defend its insured against all claims until there is no possibility of recovery for a covered claim."  CAT Internet Servs. v. Providence Wash. Ins. Co., 333 F.3d 138, 141 (3d Cir. 2002).  Because the pre-employment misrepresentation claims fell within the Policy, Defendant had a duty to pay for Plaintiff's defense until those claims were rejected by the arbitration panel.

However, under the clear language of the General Amendatory Endorsement, the Policy does not cover expenses for "which the insured has available any other valid and collectable insurance" unless the other insurance was purchased to apply in excess of the Policy.  (Doc. No. 78, Exhibit 4, General Amendatory Endorsement, § N(1).)  As Defendant admits, a self-insured retention cannot

constitute "other insurance."[3]  See General Star National Insurance Corp. v. World Oil Co., 973 F.

Supp. 943, 949 (C.D. Cal. 1997) (holding that a self-insured retention "effectively transforms what is

labeled a primary policy into an excess policy covering only amounts in excess of the amount of the

self-insured retention").  Accordingly, because Plaintiff did not have any "other insurance" for the first

one million dollars in defense costs that were used in defending an action, at least in part, concerning a

covered claim, Defendant is liable for the first million dollars in defense expenses.  On the other hand,

because the Zurich policy covered defense expenses in excess of one million dollars, under the clear

language of the General Amendatory Endorsement, Defendant is not liable for the amount above one

million covered by Zurich.

Accordingly, Defendant had a duty to defend Plaintiff in the Kaplan arbitration under the clear

language of the policy, but is liable for only the first one million dollars in defense costs.     **B.**

**COLLATERAL AND JUDICIAL ESTOPPEL**

Defendant next claims that Plaintiff should be "estopped from denying its previous position in

the Zurich arbitration."  (Doc. No. 74, at 9.)  As Defendant correctly notes, to collaterally estop

another party from asserting a position inconsistent with one previously taken under Pennsylvania law,

the following four requirements must be satisfied:

<blockquote>

(1)      the issue decided in the prior adjudication must be identical with the one
         presented in the later action;

2)       there must have been a final judgment on the merits;

</blockquote>

---

[3] Defendant cites the New Jersey case of Moore v. Nayer, 729 A.2d 449 (N.J. Super. 1999) for this proposition.  Although the Court is not bound by New Jersey state law, the Court nevertheless finds the logic compelling.

12

3)      the party against whom collateral estoppel is asserted must have been a
        party or in privity with the party to the prior adjudication; and

4)      the party against whom collateral estoppel is asserted must have had a
        full and fair opportunity to litigate the issue in question in the prior
        adjudication.

Schroeder v. Acceleration Life Ins. Co., 972 F.2d 41, 45 (3d Cir. 1992) (citing Kelly v. Warminster

Township. Bd. of Supervisors, 512 F.Supp. 658 (E.D. Pa. 1981)).  "Under Pennyslvania law,

arbitration proceedings and their findings are considered final judgments for the purposes of collateral

estoppel."  Witkowski v. Welch, 173 F.3d 192, 199 (3d Cir. 1999).

        The doctrine of judicial estoppel prevents litigants from "playing fast and loose with the courts"

by arguing a position inconsistent with one previously asserted.  New Hampshire v. Maine, 532 U.S.

742, 749-50 (2001)(internal quotations omitted).  Judicial estoppel requires a showing that:

        (1)     the party's later position was "clearly inconsistent" with its earlier
                position;

        (2)     the party had succeeded in persuading a court to accept the earlier
                position, so that judicial acceptance of an inconsistent position in a later
                proceeding would create "the perception that either the first or the
                second court was misled;" and

        (3)     the party seeking to assert an inconsistent position would derive an
                unfair advantage or impose an unfair detriment on the opposing party if
                not estopped.

New Hampshire, 532 U.S. at 751.  Judicial estoppel also applies to arbitrations.  Thompson v.

Anderson, 632 A.2d 1349, 1351 (1993).

        Defendant asserts that Plaintiff should be collaterally or judicially estopped from taking the

position that Kaplan's claims for fraudulent inducement are not excluded under the policy's

"employment-related practices" exclusion because Plaintiff originally argued that these claims

constituted "wrongful employment acts" under the Zurich policy.  (Doc. No. 74 at 9-10.)  As evidence,

Defendant compares four assertions made by Plaintiff in a pre-hearing arbitration brief to corresponding

responses to Defendant's request for admissions in the instant action.[4]  (Docs. Nos. 74 and 104.)

Plaintiff responds that the claims discussed during the Zurich arbitration occurred during Kaplan's

employment and did not include this pre-employment claim.  (Doc. No. 82, at 8-9.)

     Regardless of whether the Zurich arbitration dealt with all of Kaplan's claims or merely some,

Plaintiff's early position with regard to "wrongful employment acts" under the Zurich policy is not

inconsistent with its current position as to the "employment-related practices" exclusion under

Defendant's policy.  The term "Wrongful Employment Act" is defined by the Zurich policy as:

> any error, misstatement, misleading statement, act, omission, neglect, or
> breach of duty actually or allegedly committed or attempted by the
> [Plaintiff] . . . , in connection with any actual, alleged or constructive
> wrongful dismissal, discharge or termination of employment; breach of
> any oral, written or implied employment contract or quasi-employment
> contract; employment-related misrepresentation; violation of any
> federal, state, or local statute, regulation, ordinance, common law or
> public policy concerning employment or discrimination in employment;
> sexual or other illegal workplace harassment (including without
> limitation offensive, intimidating, coercive or unwelcome conduct,
> advances, contact or communications); wrongful failure to employ or
> promote; wrongful discipline; wrongful deprivation of a career
> opportunity; wrongful demotion or adverse change in the terms,
> conditions or status of employment; failure to grant tenure; failure to
> adopt adequate workplace or employment policies and procedures;
> illegal retaliatory treatment of employees; negligent hiring; negligent

---

[4] In each response, Plaintiff denies the admission, stating, inter alia, that the relevant document "speaks for itself."  (Plaintiff's responses to Defendant's Requests for Admissions, Doc. No. 78, Exhibit 33.)

14

> evaluation of employees; wrongful reference; employment-related
> invasion of privacy; employment-related defamation; employment-
> related wrongful infliction of emotional distress; or other employment-
> related torts.

(Zurich American Employment Practices Liability Insurance Policy 1999, Doc. No. 78, Exhibit 5, §

III(O).)  This provision is significantly different from and encompasses much more than the

"employment-related practices" exclusion contained within Defendant's policy and discussed above.

For example, a "negligent hiring" is clearly within the terms of a "wrongful employment act" whereas,

for reasons discussed above, such a claim would not fall within Defendant's "employment-related

practices" exclusion.[5]  Moreover, "wrongful employment act" is a term of art defined in an entirely

separate insurance contract.  Defendant's policy makes no reference to nor incorporates this definition

within the "employment-related practices" exclusion.  Insurance policies are highly technical documents,

and an argument that a claim was a "wrongful employment act" as defined by one policy is not

necessarily or clearly inconsistent with arguing that the same claim is not an "employment-related

practice[], polic[y], act[] or omission[]" within the meaning of a completely different policy.  Similarly, a

finding that the claim is covered by the Zurich policy, does not necessarily mean that the same claim

must be excluded by Defendant's policy.  Accordingly, the Court finds that Plaintiff should not be

collaterally or judicially estopped from arguing that Defendant's policy covers the Kaplan claims.

### C.    LATE NOTICE

Under Pennsylvania law, where the insured provides late notice of the potential claim, the

---

[5] The Zurich policy distinguishes between "negligent hiring" and "wrongful failure to employ."
(Doc. No. 78, Exhibit 5, § III(O).)

insurance company will be relieved of its responsibilities under the policy only if it can prove actual

prejudice resulting from the untimely notice.  Trustees of the Univ. of Pa. v. Lexington Ins. Co., 815

F.2d 890, 896 (3d Cir. 1987); Brakeman v. Potomac Ins. Co., 371 A.2d 193, 195-99 (Pa. 1977).  In

Brakeman, the Pennsylvania Supreme Court held that late notice will only release an insurance

company from its obligations under a policy if it can prove that the notice provision was breached and

that the breach resulted in actual prejudice to its position.  371 A.2d at 195-99.  In Trustees of

University of Pennsylvania v. Lexington Ins. Co., the Third Circuit Court of Appeals explained that:

> the purpose of the prejudice requirement is to allow an insurer to refuse
> payment only if its procedural handicap has led to disadvantageous,
> substantive results -- in other words, if the insured's violation of its
> contract has proximately caused its insurer damages.  As a New Jersey
> Superior Court decision has cogently explained, courts have required a
> showing not only of the loss of substantial defense opportunities but
> also of a "likelihood of success" in defending liability or damages if
> those opportunities had been available.  Morales v. National Grange
> Mut. Ins. Co., 176 N.J. Super. 347 (1980). . . .  The mere interference
> with [the insurance company's] right to "associate" in the defense of the
> claim is too amorphous and cannot itself constitute prejudice unless [the
> insurance company] can demonstrate that earlier notice would probably
> have led to a more advantageous result.

815 F.2d at 898-899.

Under the policy:

> (a)     [Plaintiff] must see to it that [Defendant is] notified as soon as
>         practicable of an "occurrence" or an offense which may result
>         in a claim.

* * *

> (b)     If a claim is made or a "suit" is brought against any insured,
>         [Plaintiff] must:

16

       (1)       Immediately record the specifics of the claim or "suit"
                    and the date received; and

       (2)       Notify [Defendant] as soon as practicable.

     [Plaintiff] must see to it that [Defendant] receive[s] written notice of the
     claim or "suit" as soon as practicable.

(Doc. No. 78, Exhibit 4, § IV (2).)  The policy defines "suit" as "a civil proceeding in which damages .

. . to which this insurance applies are alleged" including arbitration proceedings.  (Id., Exhibit 4, §V

(16).)  However, the policy does not specify whether "a claim," under the notice section, is any claim

made against the insured or only those claims that could trigger coverage under the insurance policy.

     In the instant matter, Plaintiff received notice of Kaplan's employment agreement claims by

letter dated November 18, 1999.  (Doc. No. 78, Exhibit 18.)  On January 28, 2000, Plaintiff received

a courtesy copy of Kaplan's arbitration demand, prior to Kaplan formally filing an Arbitration Demand

on February 9, 2001.  (Id., Exhibits 20-21.)  Plaintiff notified Zurich on July 6, 2001 and Defendant on

August 27, 2001.  (Id., Exhibits 23-24.)  Therefore, Plaintiff complied with the Policy's notice

requirement 21 months after receiving Kaplan's initial letter.  Plaintiff accurately points out that

Kaplan's November 18, 1999  letter did not assert her claim for injury to her personal reputation or

any claim that might have been covered under the Policy.  (Doc. No. 82, at 11 n.3.)  Kaplan first

asserted this claim in her Arbitration Demand, which Plaintiff received only seven months prior to

notifying Defendant.  However, as stated above, the Policy's notice provision does not define "a claim"

as only those claims that might be covered under the Policy.  The notice provision can be read as to

require an insured to give notice when any claim is asserted against it.  This reading of the provision

makes sense considering that actions, which may not initially assert claims that are covered, often can

grow to include covered claims prior to trial/arbitration, as in the present case. However, regardless of how one interprets the meaning of the term "claim" in the notice provision of the Policy, Plaintiff's seven-month delay before notifying Defendant is long enough by itself to constitute a breach of the provision. Plaintiff provides no answer as to why it delayed so long in notifying Defendant of Kaplan's suit, nor why this delay was "practicable" under the circumstances.

Nonetheless, although the Court finds that Plaintiff breached the notice provision, the Court does not find any evidence that this breach resulted in actual prejudice to Defendant's position during arbitration. Brakeman, 371 A.2d at 197-99. Kaplan's depositions were held on February 20-21, 2002 and the case was heard in arbitration on March 12, 2002, well after Defendant was notified of the Arbitration Demand. (Defendant's Claims Specialist's Notes, Doc. No. 78, Exhibit 27.) Moreover, Plaintiff prevailed on the reputation claims at arbitration. (Arbitration Award, Doc. No. 78, Exhibit 31.)

Defendant initially argues that it was prejudiced by Plaintiff's delay as a matter of law, citing Metal Bank of America, Inc. v. Ins. Co. of N. America, 520 A.2d 493 (Pa.. Super. 1987). However, Defendant's reliance upon this case is misplaced. In Metal Bank of America, the Pennsylvania court found that the insurance carrier had been prejudiced as a matter of law when the insured waited nine years after the event occurred to notify the insurer. 520 A.2d at.494-96. The court found that, because of the extensive delay, "[t]he insurers did not have an opportunity to investigate the facts or participate in the defense of the action against Metal Bank[,] . . . a settlement was already a fait accompli, and the insurers, who were being called upon to provide funds for the settlement had no opportunity to control the proceedings or in any way protect themselves." Id. at 359-360. In the

18

instant matter, Defendant proffers no evidence that Plaintiff's delay caused witnesses to be unavailable, evidence to be destroyed, or otherwise prevented or delayed Defendant from investigating Kaplan's claims.  Moreover, for reasons discussed more fully below, the delay did not prevent Defendant from participating in the defense of the action or in settlement negotiations.  Accordingly, the Court finds that Plaintiff's delay in providing notice did not prejudice Defendant as a matter of law.

Alternatively, Defendant argues that it was actually prejudiced by Plaintiff's delay and "lack of cooperation in providing [Defendant] with enough information to come 'up to speed' on the case," causing Defendant to "lose its opportunity to effect an early resolution to this matter."  (Doc. No. 74, at 23.)  Defendant cites only to the November 16, 2004 deposition of Kaplan's attorney, Jay Berke, in which attorney Berke explained that he would have involved Defendant in more settlement discussions, but felt Defendant did not have a proper grasp of the issues.  (Doc. No. 78, Exhibit 7.)  Although this failure to "control and contribute to the defense" did not prejudice Defendant with regard to the arbitration award, since Kaplan lost on her reputation claims, Defendant argues that if it had been properly notified and if Plaintiff's defense counsel had more fully cooperated with Defendant during the lead up to trial, Defendant may have been able to convince Kaplan to settle early, mitigating the cost of defense.  (Doc. No. 74, at 23.)  However, this argument is speculative and not supported by the evidence.

First, Defendant had no right under the Policy to choose defense counsel in the Kaplan arbitration.  (Liberty Mutual CGL Policy for Policy Year 1999, Doc. No. 78, Exhibit 4.)  Therefore, earlier notice would not have allowed Defendant to choose or control Plaintiff's defense counsel.  Second, the record demonstrates that Defendant was aware of pre-trial negotiations, but rejected

offers because Defendant felt, as it feels now, that Kaplan's claims did not fall under the Policy.[6]  (Doc.

No. 83, Exhibits 17-21.)  Defendant puts forth no evidence, and the Court finds none, to suggest that it

would have settled had it been notified seven months earlier.  Accordingly, the Court finds that

Defendant did not suffer prejudice because of the delay and Defendant's motion for summary judgment

upon this claim must be denied.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50.



### D.      BAD FAITH

In Count II of its Amended Complaint (Doc. No. 29), Plaintiff asserts a claim against

Defendant under Pennsylvania's  "bad faith" statute, which provides that:

> In an action arising under an insurance policy, if the court finds that the

---

[6] In her March 18, 2002 notes, Defendant's Senior Technical Claims Specialist Marianne Boykin states, "[I] talked to Julie Larson (coverage counsel for Zurich) . . . . [and she] believes that [the] case should be resolved for $15 mil. . . . [I] explained that our position is that coverage under our policy is extremely limited and I don't see our liability that way."  (Doc. No. 83, Exhibit 17.)  On March 26, 2002, Boykin wrote, "Received call from [Plaintiff's] defense counsel Jay Berke. . . . [Kaplan] has told him that they want to take this case to the mat but the carriers need to step up to the plate and pay 50% of any offer. . . . [I] told him that I have received nothing from him since start of arbitration.  he states that is correct but he knows that Julie Larsen was talking to me.  I told him yes but I haven't gotten any information that leads me to believe that our coverage is triggered."  (Doc. No. 83, Exhibit 18.)  On March 27, 2002, Boykin wrote, "Talked to HO examiner, Brad [Whittier], this morning.  He agrees that nothing to date shows that any damages being claim[ed] by [Kaplan] is covered under our policy. . . . [I] called INSD, Jim Lott [and] left him [a] detailed voice mail message that . . . we have no evidence to date that any damages being claim[ed] by [Kaplan] are covered under our policy but if he has something different to forward it to us and we will review.  As such, we will not be authorizing any money at this time."  (Doc. No. 83, Exhibit 19.)  On April 9, 2002, Boykin wrote, "[Brad Wittier] agrees that damages that [Kaplan] has presented in arbitration do not fall under our 'coverage' for [Plaintiff]. . . . [I] explained that [Defendant] at this point only sees that we have exposure for defense of this case."  (Doc. No. 83, Exhibit 21.)

insurer has acted in bad faith toward the insured, the court may take all
of the following actions:

> (1) Award interest on the amount of the claim from the date the
> claim was made by the insured in an amount equal to the prime
> rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. ANN. § 8371.  Bad faith is "any frivolous or unfounded refusal to pay proceeds of

a policy, and that such conduct imports a dishonest purpose and means a breach of a known duty . . .

through some motive of self-interest or ill will."  UPMC Health Sys. v. Metro. Life Ins. Co., 391 F.3d

497, 505 (3d Cir. 2004) (quoting Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688

(Pa. Super. Ct. 1994)) (internal quotation marks omitted).  In order to recover under a claim of bad

faith, Plaintiff must "show [1] that the defendant did not have a reasonable basis for denying benefits

under the policy and [2] that defendant knew or recklessly disregarded its lack of reasonable basis in

denying the claim."  Id.  The essence of a bad faith claim is "the unreasonable and intentional (or

reckless) denial of benefits."  UPMC Health Sys., 391 F.3d at 506 (citing Cresswell v. Nat'l Mut. Cas.

Ins. Co., 820 A.2d 172, 180 (Pa. Super. Ct. 2003)).

Although the Court does not agree with Defendant's interpretation of the policy language at

issue, Plaintiff offers no evidence, and the Court finds none, to indicate that Defendant's denial was

reckless or unreasonable.  Moreover, contrary to Plaintiff's assertions, Defendant's initiation of the

declaratory action in California does not, by itself, indicate bad faith.  Accordingly, Defendant's motion

for summary judgment regarding Plaintiff's bad faith claim will be granted and Count II of Plaintiff's

Amended Complaint (Doc. No. 29) will be dismissed.

###   E.      DAMAGES

Lastly, there appears to be a dispute of material facts with regard to Plaintiff's actual defense costs.  Plaintiff alleges that its reasonable costs to defend itself in the Kaplan matter were $2.1 million. (Doc. No. 122.)  However, Plaintiff has not provided the Court with any evidence to explain how this sum was calculated or that the costs incurred were reasonable.  Moreover, Defendant questions this figure and Plaintiff's damages in general.  (Doc. No. 74.)  As discussed above, Defendant owed Plaintiff a duty to defend under the language of the Policy.  However, because there remains a question as to the extent of Plaintiff's actual defense costs, the Court cannot grant Plaintiff's motion for summary judgment relating to damages.

## V.    <u>Conclusion</u>

In conclusion, Plaintiff's motion for summary judgment will be granted in part and denied in part, and Defendant's motion for summary judgment will be granted in part and denied in part. Defendant had a duty to defend Plaintiff in the Kaplan arbitration under the Policy and Defendant breached this duty by denying coverage.  However, Defendant's liability to pay for Plaintiff's defense costs is limited to Plaintiff's actual costs not covered by the Zurich policy.  The Court found no evidence that Defendant acted with bad faith, as defined by the Pennsylvania Bad Faith statute, 42 Pa. Cons. Stat. Ann. § 8371.

## VI.   <u>Order</u>

**AND NOW** this 7th  day of June, 2005, upon consideration of the cross motions for Summary

Judgment, all responsive pleadings thereto, and the record as a whole, for reasons set forth in the within

memorandum, **IT IS HEREBY ORDERED THAT** Plaintiff's Motion for Summary Judgment is

**GRANTED in part** and **DENIED in part**, as follows:

    (1)    JUDGMENT is ENTERED IN FAVOR of Plaintiff on Count I of the Amended
Complaint and AGAINST Defendant.  (Doc. No. 29.)

    (2)    The Court finds that Defendant had a duty to defend Plaintiff in the Kaplan arbitration
and breached its Commercial General Liability policy in refusing to reimburse Plaintiff
for costs incurred in defense of the Kaplan claims.

    (3)    In all other respects, Plaintiff's motion for summary judgement is denied.

**IT IS FURTHER ORDERED THAT** Defendant's Motion for Summary Judgment is **GRANTED**

**in part** and **DENIED in part**, as follows:

    (1)    JUDGMENT is ENTERED IN FAVOR of Defendant and AGAINST Plaintiff on
Count II of the Amended Complaint (Doc. No. 29.)

    (2)    Defendant's action did not constitute Bad Faith under the Pennsylvania Bad Faith
statute, 42 Pa. Cons. Stat. Ann. § 8371.

    (2)    In all other respects, Defendant's motion for summary judgment is denied.

Defendant's Objections to Evidence in Opposition to Plaintiff's Motion for Summary Judgment are

**OVERRULED**.  (Doc.  No. 89.)  A telephone status conference is scheduled for June 21, 2005 at

2:00 p.m..  Plaintiff's counsel shall initiate this conference call.


        __ S/ Yvette Kane_____
        Yvette Kane
        United States District Judge