**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RITE AID CORPORATION,** | : | |
| | : | **CIVIL ACTION NO. 1:CV-03-1801** |
| **Plaintiff** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| | : | |
| **LIBERTY MUTUAL FIRE** | : | |
| **INSURANCE CO., et al.,** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

This dispute over insurance coverage has its origins in claims by Rite Aid executive Beth

Kaplan ("Kaplan") that the company misrepresented and withheld critical information

concerning Rite Aid's financial position and irregularities occurring at the company.  Kaplan

prevailed at arbitration on some of her claims.  Thereafter, Rite Aid sought reimbursement from

Liberty Mutual Fire Insurance Co. ("Liberty Mutual") pursuant to the terms of its Commercial

General Liability Policy.  Liberty Mutual refused coverage and on October 8, 2003, Rite Aid

initiated the instant action alleging that Liberty Mutual breached the insurance policy (Count I)

and violated the Pennsylvania Bad Faith statute, 42 Pa. Cons. Stat. Ann. § 8371 (Count II).[1]

On June 7, 2005, this Court granted in part Rite Aid's motion for summary judgment as

to Count I of the Complaint, holding that Liberty Mutual had a duty to defend Rite Aid in the

Kaplan arbitration and that Liberty Mutual breached its duty in refusing to reimburse Rite Aid

for costs incurred in its defense.  (Doc. No. 134.)  However, pursuant to the terms of the policy,

---

[1] Zurich American Insurance and Federal Insurance Company were previously
defendants in this action until Rite Aid voluntarily dismissed them on February 18, 2005 and
March 18, 2005 respectively.

the Court found Liberty Mutual liable for only the first one million dollars in defense costs incurred by Rite Aid.  (Id.)  Because a disputed issue of fact existed as to the extent of Rite Aid's actual defense costs, the Court denied Rite Aid's motion for summary judgment relating to damages.  (Id.)  The Court granted Liberty Mutual's motion for summary judgment as to Count II of the Complaint, finding that Liberty Mutual's action did not constitute bad faith under the Pennsylvania Bad Faith statute.  (Id.)

On July 28 and 29, 2005, the Court heard testimony on Rite Aid's alleged damages.  Rite Aid offered the testimony of its lead attorney during the Kaplan arbitration, Jay Berke, Esq., a partner at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), along with documentary evidence regarding the nature and extent of its covered legal expenses.  Liberty Mutual countered with the testimony of Susan Cooper, Esq., whom it offered as an expert in the area of legal auditing.  Rite Aid objected to the testimony of Cooper and to the admission of certain exhibits relating to the testimony.  Because Rite Aid first raised its objections in a pretrial memorandum rather than in a motion in limine, the Court received the disputed testimony and reserved ruling pending post-trial briefing.  After reviewing the parties' post-trial briefs, the Court entered a memorandum and order finding Susan Cooper unqualified to testify as an expert on the reasonableness or propriety of the legal fees incurred during the Kaplan arbitration, and excluded her testimony and the exhibits relating thereto.  (Doc. No. 159.)  On March 13, 2006, the parties filed trial briefs and proposed findings of fact.  (Doc. Nos. 161-163.)  The Court now makes the following findings of fact and conclusions of law.

I.     **FINDINGS OF FACT**

Rite Aid is a Delaware corporation having its principal place of business in the Commonwealth of Pennsylvania.  Liberty Mutual is a Massachusetts insurance corporation having its principal place of business in Massachusetts.

Plaintiff's claim for coverage is based on a claim against Rite Aid by Beth Kaplan, a former Rite Aid executive.  In August 1996, Kaplan left her executive position with Proctor & Gamble's Cosmetics and Fragrance Division to become Rite Aid's Executive Vice-President for marketing.  (Tr. 33-34; Pl. Ex. 10.)  According to Kaplan, her decision to sign an employment contract with Rite Aid was based in part on information provided in Rite Aid's public disclosures, annual reports, and SEC filings.  (Pl. Ex. 10.)  After two and one-half years, Rite Aid became embroiled in stockholder lawsuits and regulatory investigations regarding certain financial practices conducted by Rite Aid's management.  (Tr. 34.)  These financial irregularities resulted in a $1.6 billion correction to prior years' earnings, dramatic reduction in Rite Aid's stock price, and criminal prosecution of members of Rite Aid's management.  (Pl. Ex. 10.)  On November 12, 1999, Kaplan terminated her employment agreement with Rite Aid and resigned from the company.  (Pl. Ex. 10 ¶ 21.)

Kaplan notified Rite Aid of her claims on November 18, 1999.  (Pl. Ex. 6; Tr. 58.)  On February 9, 2001, Kaplan filed a demand for arbitration, wherein she alleged, inter alia, that Rite Aid had negligently or intentionally misrepresented its financial condition in documents given to her prior to her accepting employment with the company, thereby fraudulently or negligently inducing her to take employment with a company financially weaker than advertised.  (Tr. 35; Pl. Ex. 10.)  Kaplan also alleged that the taint of association with Rite Aid impaired her ability to secure subsequent employment commensurate with her experience.  (Tr. 37-38; Pl. Ex. 10.)

Kaplan sought $70 million dollars in damages.  (Tr. 38.)

Liberty Mutual issued a Commercial General Liability policy to Rite Aid for years 1997, 1998, and 1999 ("Policy").  (Pl. Exs. 1-3.)  At all relevant times, Rite Aid was also covered by an Employment Practices Liability Insurance policy issued by Zurich American Insurance ("Zurich").  (Pl. Ex. 4.)  By letter dated July 6, 2001, Rite Aid notified Zurich of the arbitration. (Pl. Ex. 12.)  By letter dated August 27, 2001, Rite Aid notified Liberty Mutual of the arbitration with Kaplan.  (Pl. Ex. 13.)  On December 12, 2001, Liberty Mutual provided Rite Aid a formal "coverage position letter" in which it acknowledged that Kaplan's "claims of damage to professional reputation potentially trigger[ed] coverage for the demand under Rite Aid's Commercial General Liability policies" and as such, Liberty Mutual "will provide coverage for Rite Aid for this demand, subject to the position set out [in the letter]."  (Pl. Ex. 13.) Notwithstanding this representation, Liberty Mutual concluded that Kaplan's claims were not covered under the Policy and declined Rite Aid's request to reimburse Rite Aid for its legal expenses relating to the Kaplan arbitration.

During arbitration, Rite Aid was represented by the law firm of Skadden, Arps, Slate, Meagher & Flom LLP.  Jay Berke, Esq. is a partner in Skadden's labor and employment law department and was Rite Aid's lead attorney in the Kaplan arbitration.  (Tr. 23-24, 57.)  The Kaplan arbitration lasted eleven days and filled a 2,500 page transcript.  (Tr. 50-51.)  Berke described the arbitration as involving "extremely complex issues" initiated by a "sophisticated participant represented by sophisticated counsel . . . ."  (Tr. 44-50.)  Pre-trial discovery produced 450 boxes containing "several hundred thousand" pages of documents.  (Tr. 43-43.)  The arbitration also required the parties to brief multiple pre- and post-trial issues.  (Tr. 50-51.)

In representing Rite Aid, Skadden employed the services of Dr. David Tabak, an economics expert with National Economic Research Associates Economic Consulting ("NERA"), to provide expert opinion and testimony on complex economic issues raised during the arbitration. (Tr. 63-64.) The Skadden defense team also coordinated with Ballard Spahr Andrews & Ingersoll, LLP ("Ballard"), which at the time was defending Rite Aid against a shareholder class action based upon the same financial irregularities that prompted Kaplan's claims. Rite Aid incurred and paid $2,125,569 in legal expenses in defending the Kaplan arbitration. (Tr. 62.) Rite Aid's defense costs include $2,039,367 in attorneys' fees and costs billed by Skadden, $16,460 in attorneys' fees and costs billed by Ballard, and $69,742 in expert services billed by NERA. (Pl. Exs. 41, 44, 45.) Upon review of the entire record, the Court finds that these expenses were reasonable and necessary in defense of Kaplan's claims.

On November 14, 2002, an arbitration panel found that Kaplan was entitled to $12,896,466, plus interest, in damages on some of her breach of contract claims.[2] (Pl. Ex. 27.) After offsetting the award by $7,951,028, plus interest, because of loans Kaplan received from Rite Aid during the course of her employment, the panel ordered Rite Aid to pay Kaplan $4,945,438, plus interest. The arbitration panel reserved ruling on Kaplan's claim for attorneys' fees pending briefing on the matter. (Id. at 13.)

On January 22, 2003, Rite Aid and Kaplan entered into a confidential settlement agreement, under which Rite Aid agreed to pay Kaplan $4,945,438, plus interest, and forgive Kaplan's loans, which with interest collectively equaled $7,951,028. (Pl. Ex. 29 ¶¶ 1(a), (c),

---

[2] The panel found in favor of Kaplan on her Long Term Incentive Plan I and stock option breach of contract claims. (Pl. Ex. 27.) The panel denied all of Kaplan's other claims.

2(c); Pl. Ex. 27.)  Rite Aid also agreed to pay Kaplan's arbitration attorneys' fees in the amount of $2,650,000.  (Pl. Ex. 29 ¶ 1(b).)

Rite Aid sought partial reimbursement for these amounts from its insurers and both Liberty Mutual and Zurich refused coverage.  Thereafter, Rite Aid initiated arbitration proceedings against Zurich to recover all or part of the monies it paid to Kaplan.  (Pl. Ex. 50.)  On March 26, 2004, the arbitration panel returned a finding in favor of Rite Aid in part and awarded it $7,669,093, plus interest.  (Id. at 7-8.)  On December 2, 2004, Rite Aid and Zurich entered into a confidential settlement agreement, under which Zurich agreed to pay Rite Aid $8,400,000.  (Pl. Ex. 51.)  Recovery of Rite Aid's attorney's fees incurred during the Kaplan arbitration was neither part of the Zurich arbitration nor the settlement agreement.  (Pl. Exs. 50-51.)  On October 8, 2003, Rite Aid initiated this civil action against Liberty Mutual to recover the $2,125,569 it incurred in legal expenses defending against Kaplan's claims.  (Doc. No. 1.)

## II.   DISCUSSION AND CONCLUSIONS OF LAW

The Court has jurisdiction over this civil action under 28 U.S.C. § 1332.  Venue is proper under 28 U.S.C. § 1391 because the insurance policies at issue in this action were issued, delivered, and entered into in the Middle District of Pennsylvania and the underlying claims asserted by Kaplan against Rite Aid arose in this district.

By Order dated June 7, 2005, this Court held that Liberty Mutual had a contractual duty to defend Rite Aid in the Kaplan arbitration and that Liberty Mutual breached the Policy by refusing to reimburse Rite Aid for costs incurred in defense of Kaplan's claims.  (Doc. No. 134.)  However, the Court further found that Liberty Mutual's liability is capped at the first $1 million of Rite Aid's reasonable defense expenses, in accordance with the limitations set forth in the

"other insurance" clause of the Policy.  (Id.)  Accordingly, there remain only two issues before

the Court:  (1) the amount of reasonable and necessary defense costs for which Liberty Mutual is

required to reimburse Rite Aid, not to exceed $1 million; and (2) whether Rite Aid is entitled to

pre- and/or post-judgment interest.  The Court will address each issue in turn.

   **A.  Rite Aid's Reasonable Defense Expenses**

   Liberty Mutual contends that Rite Aid is not entitled to recover any damages at all

because Zurich paid $8.4 million in settlement to Rite Aid and because Rite Aid has already

been reimbursed for both the $5 million it paid Kaplan in settlement plus its $2.1 million in

attorneys' fees.  (Doc. No. 163 at 4.)  This argument ignores the $7.5 million in loan forgiveness

that Rite Aid paid on Kaplan's behalf as part of the settlement, which raises Rite Aid's net loss

(excluding attorneys' fees) to more than $12 million.  (Pl. Ex. 29; Tr. 56-57.)  Moreover, the

Zurich settlement clearly specifies that the $8.4 million paid by Zurich constitutes only partial

recovery for the $12.9 million in monies paid to or on behalf of Kaplan.  (Pl. Ex. 51.)  The

arbitration and settlement make no mention of reimbursement for Rite Aid's attorneys' fees and

there is no basis for a determination that the Zurich settlement reimbursed Rite Aid's attorneys'

fees.  (Pl. Exs. 50-51.)  Accordingly, contrary to Liberty Mutual's arguments, Rite Aid has not

been compensated for the legal fees it incurred in defense of the Kaplan claims.

   1.  <u>The Reasonableness and Necessity of Certain Fees</u>

   The parties agree that only those expenses that were reasonably and necessarily incurred

in defense of the claims are reimbursable under the Policy.  (Doc. Nos. 161 at 8; 162 at 11.)  Rite

Aid has substantiated its fees through the invoices generated by Skadden, Ballard, and NERA

(Pl. Exs. 41, 44-45), a detailed accounting of the hours billed by Skadden (Pl. Ex. 42), and the

testimony of lead counsel, Jay Berke, Esq.  (Tr. 23-155.)  Berke testified that the arbitration was highly complex and time consuming and reasonably required Rite Aid to incur over $2 million dollars in expenses.  (Tr. 62.)   Berke further testified that Rite Aid paid its defense expenses in full.  (Id.)

Although Liberty Mutual offered no credible testimony to rebut Rite Aid's evidence at trial, Liberty Mutual now argues that the following expense amounts are either unreasonable, unnecessary, or otherwise unrecoverable as a matter of law:  all fees billed by Ballard; $86,814 paid to Skadden to litigate counter-claims against Kaplan; and $166,950.62 in fees paid to Skadden for work performed by legal assistants.[3]  (Doc. No. 163.)  Liberty Mutual cites no authority and offers no credible evidence in support of its arguments that these fees are unrecoverable.[4]  In contrast, Jay Berke testified that all of these expenses were necessary to the defense of the Kaplan claims and were reasonable given the complexity of the case.  (Tr. 74-80, 85-88, 114-119).[5]  Moreover, courts have found that the fact that a client has paid its own

_____

[3] Liberty Mutual also argues that the Court should limit its analysis to the first $1 million in fees billed, ignoring the remaining $1,125,570 of legal expenses incurred in defense of the Kaplan claims.  Liberty Mutual cites no authority, and the Court finds none, in direct support of this limitation.  Regardless, for the reasons discussed below, the Court finds that Rite Aid actually incurred $2,125,570 in reasonable and necessary legal expenses.  Therefore, even if the Court were to follow Liberty Mutual's analysis, Liberty Mutual would be still liable for the entire $1 million Self-Insured Retention amount.

[4] Liberty Mutual relies exclusively on a decision of the United States Bankruptcy Court for the District of Utah in support of its argument that clerical work should not be reimbursed by the party asked to pay for legal fees.  See In re CF & I Fabricators of Utah, Inc., 131 B.R. 474, 489 (Bankr. D. Utah 1991).  This case addresses the reasonableness of fees and expenses that may be paid by a bankrupt estate pursuant to the provisions of the United State Bankruptcy Code and has no apparent application to the fee dispute before the Court.

[5] Berke testified that the work performed by legal assistants was necessary to the defense and allowed the attorneys, who billed at a much higher rate, to focus on more important issues.  (Tr. 74-88.)  Berke testified that the counterclaims were "inextricably entwined" with Rite Aid's

defense costs without any assurance of reimbursement, such as in this case, is compelling evidence that the costs were reasonable and necessary.  See Medcom Holding Co. v. Baxter Travelnol Labs, 200 F.3d 518, 520 (7th Cir. 1999) ("If attorneys submit bills that meet market standards of detail, their omission of information to which courts resort in the absence of agreement is of no moment.  If the bills were paid, this strongly implies that they meet market standards.").  The fact that Kaplan's attorneys billed her $2.6 million in attorneys' fees to prosecute the arbitration also weighs heavily in favor of a finding that the $2.1 million in Rite Aid's defense expenses represent a reasonable market rate.  Upon review of the evidence, the Court finds that Rite Aid's $2.1 million legal costs were reasonable and necessary to the defense of the Kaplan claims.

### 2.    The Recovery of Pre-Tender Fees

Liberty Mutual also objects to payment of any fees billed prior to Rite Aid's August 27, 2001 letter notifying Liberty Mutual of the Kaplan claims.[6]  (Doc. No. 163 at 9-11.)  Under Pennsylvania law, where an insured provides an insurer late notice of a potential claim, the insurance company will be relieved of its obligations under the policy only if it can prove actual prejudice resulting from the untimely notice.  Trustees of the Univ. of Pa. v. Lexington Ins. Co., 815 F.2d 890, 896 (3d Cir. 1987); Brakeman v. Potomac Ins. Co., 371 A.2d 193, 195-99 (Pa.

---

defense.  (Tr. 77-80.)  Berke further testified that Ballard had defended Rite Aid in a class action suit on the same alleged securities fraud that lay at the heart of Kaplan's claims and that Ballard assisted in defending Rite Aid against Kaplan's claims by providing the Skadden lawyers with factual information, extensive discoverable documents, and through discussing relevant legal points.  (Tr. 114-116.)

[6] Rite Aid notified Liberty Mutual of the Kaplan action on August 27, 2001.  Prior to this date, Skadden had billed $499,040 and Ballard had billed $2,933 in Kaplan defense costs.

1977).  In <u>Brakeman</u>, the Pennsylvania Supreme Court explained:

> In short, the function of a notice requirement is to protect the
> insurance company's interests from being prejudiced.  Where the
> insurance company's interests have not been harmed by a late
> notice, even in the absence of extenuating circumstances to excuse
> the tardiness, the reason behind the notice condition in the policy is
> lacking, and it follows neither logic nor fairness to relieve the
> insurance company of its obligations under the policy in such a
> situation.

371 A.2d at 197.

Liberty Mutual cites <u>Safeguard Scientifics, Inc. v. Liberty Mutual Ins. Co.</u>, 766 F. Supp.

324 (E.D. Pa. 1991), in support of its argument that pre-tender fees incurred by an insured are

not recoverable.  However, on appeal the Third Circuit reversed the district court's holding on

this precise issue.  <u>Safeguard Scientifics, Inc. v. Liberty Mutual Ins. Co.</u>, 961 F.2d 209 (3d Cir.

1992 (table)); <u>Tig Ins. Co. v. Nobel Learning Cmtys., Inc.</u>, 2002 U.S. Dist. LEXIS 10870 (E.D.

Pa. 2002).[7]  Moreover, the Court finds persuasive the Tenth Circuit's analysis in <u>TPLC, Inc. v.

United National Ins. Co.</u>, 44 F.3d 1484, 1491-1493 (10th Cir. 1995).  Applying Pennsylvania law,

the Tenth Circuit found that an insurer had a duty to defend the insured and reimburse the

insured for expenses incurred in that defense.  <u>Id.</u> at 1492 (citing <u>Imperial Cas. & Indem. Co. v.

High Concrete Structures</u>, 858 F.2d 128, 131 n.2 (3d Cir. 1988)).  Relying upon <u>Brakeman</u>, the

court rejected the argument that "the insurer can avoid the obligation to reimburse the insured for

defense costs incurred prior to receipt of notice" and held that "in the absence of a showing of

prejudice, the insurer's duty to defend includes the duty to reimburse for reasonable costs of

---

[7] The Third Circuit reversed the district court in a non-precedential, unpublished opinion.
Although such opinions are not regarded as precedents that bind this Court, the reversal weighs
heavily against the persuasive value of the district court's holding.

defense incurred prior to notice, as well as for subsequent defense costs." Id. at 1493.

Like the Tenth Circuit, this Court does not read Brakeman narrowly to hold that, absent prejudice, an insurer has a duty to defend, but that duty only arises after notice. By Order dated June 7, 2005, this Court found that, although Rite Aid did not provide Liberty Mutual with timely notice, Liberty Mutual did not suffer prejudice because of the delay and the timing of the notice did not obviate Liberty Mutual's duty under the Policy to defend rite Aid or to reimburse Rite Aid's reasonable defense costs. (Doc. No. 134 at 19-20.) Because Liberty Mutual was not prejudiced by the delay in notice, Liberty Mutual's duty to defend encompasses reimbursement of all reasonable expenses incurred in Rite Aid's defense, up to the Policy's limit, including those fees incurred pre-tender.[8]

### 3.   Conclusion

The Court finds that Rite Aid incurred $2,125,570 in defense expenses and that these expenses were reasonable and necessary. In accordance with the Policy's "Other Insurance" provision, Liberty Mutual's obligation to reimburse Rite Aid's legal expenses is capped at $1,000,000. Accordingly, the Court finds that Rite Aid is entitled to $1,000,000 in damages on Count I of its Complaint.

---

[8] Liberty Mutual asserts that Section IV(2)(d) of the Policy precludes rite Aid from recovering pre-tender legal expenses. That section of the Policy provides that "[n]o insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense . . . without [Liberty Mutual's] consent." Pl. Ex. 3 at § IV(2)(d). Liberty Mutual's reliance on this provision is misplaced. Liberty Mutual never granted Rite Aid consent because Liberty Mutual concluded that Kaplan's claims did not trigger liability under the Policy. Because Kaplan's claims were covered by the Policy and Liberty Mutual was not prejudiced by the late notice, Liberty Mutual has a duty to defend Rite Aid, including a duty to reimburse Rite Aid for pre-tender legal expenses.

**B.      Pre- and Post-Judgment Interest**

Rite Aid seeks an award of pre-judgment interest on its defense expenses.   Both parties

concede, and the Court agrees, that Pennsylvania would apply its own law to resolve the pre-

judgment interest issue in this case.   Under Pennsylvania law, interest is available as a matter of

right on money owed under a contract.   <u>Fernandez v. Levin</u>, 548 A.2d 1191, 1193 (Pa. 1988).

Unless otherwise contracted, the statutory rate of interest at 6% per annum applies.   41 Pa. Cons.

Stat. Ann.   § 202.   Pre-judgment interest is calculated from the time the money became due or

payable by the breaching party.   <u>Fernandez v. Levin</u>, 548 A.2d 1191, 1193 (Pa. 1988) (adopting

Restatement (Second) of Contracts § 354 (1981)).[9]

Rite Aid calculates the pre-judgment amount to be $222,194 as of July 31, 2005, plus

$164.38 per day until the date of this Order.   (Doc. No. 160 Ex. A.)   Rite Aid argues that pre-

judgment interest should begin on the date Liberty Mutual was notified of the Kaplan claims,

August 27, 2001, and should increase as Rite Aid's legal expenses increased until March 25,

2002, when Rite Aid's legal expenses reached $1 million.   (<u>Id.</u>).   Based upon these calculations,

pre-judgment interest would equal $284,494.02 ($222,194.00 + ($164.38 x 379 days)).

Liberty Mutual disputes the August 27, 2001 starting date and argues that the legal

expenses did not become "due or payable" under Rite Aid actually tendered to them the firms'

invoices.   (Doc. No. 163.)   Liberty Mutual notes that the August 27, 2001 claim notification

letter contained no invoices or a specific request for reimbursement.   (Pl. Ex. 13.)   The first

---

[9] "Interest is not payable as damages for non-performance until performance is due. . . . If the performance is to be rendered on demand, interest does not begin to run until a demand is made, even though an action might be maintained without a demand."   Restatement (Second) of Contracts § 354 (comment b).

request for reimbursement in the record is contained in an email by James Lott, Rite Aid's Vice-President of risk management, sent to Liberty Mutual Senior Technical Claims Specialist Marianne Boykin.  (Pl. Ex. 21.)  This email states:

> Every day I rush to the mail and look for my check in the amount
> of $1,165,995.20 as reimbursement for my legal fees through
> 2/28/02 in the [Kaplan matter] that was sent to you on 5/30/02.  As
> of today I still have not received it.  I am sure this is just an
> oversight on Liberty Mutual's part.  Would you please check to see
> when I can expect my $$$$.

(Pl. Ex. 21.)  The next correspondence on record is an August 8, 2002 letter from Lott to Boykin, which included copies of paid invoices for defense costs from February 28, 2002 through June 30, 2002, totaling $620,348.90.  (Pl. Ex. 22.)  In that letter, Lott stated that Rite Aid's total legal expenses stood at $1,786,344.10 and requested a "check for this amount."  (Id.)  Liberty Mutual argues that any pre-judgment interest should begin on August 8, 2002, the first time on record Rite Aid tendered Liberty Mutual a bill for its legal expenses.  (Doc. No. 163 at 12.)  Liberty Mutual contends that "[m]erely incurring legal fees or notifying Liberty Mutual of the Kaplan claim . . . did not make [the expenses] 'due or payable' by Liberty Mutual, as no demands for payment were made at those times."  (Id. at 12-13.)

The Court finds that Rite Aid's approach is proper.  Pennsylvania law provides that in cases where the insurer completely denies liability, the granting of pre-judgment interest is calculated from the date of loss rather than the date of notice.  Compagnie Des Bauxites de Guinea v. Insurance Co. of North America, 794 F.2d 871, 879 (3d Cir. 1986); Trustees of Univ. of Pa., 815 F.2d at 909 (citing Western & Atlantic Pipe Lines v. Home Ins. Co., 22 A. 665 (1891)); Hartman v. Motorists' Mut. Ins. Co., 2006 U.S. Dist. LEXIS 1719 (W.D. Pa. 2006). Because Liberty Mutual denied liability in toto, Rite Aid may recover interest from the date the

13

legal expenses were incurred, even if Rite Aid requested reimbursement at a much later date. Therefore, the Court accepts Rite Aid's pre-judgment calculations found in Exhibit A of its Proposed Findings of Fact and Conclusions of Law (Doc. No. 160) and will award Rite Aid $284,494.02 in pre-judgment interest.

Rite Aid also argues that it is entitled to post-judgment interest calculated in accordance with 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court . . . calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . ." 28 U.S.C. § 1961(a).  Liberty Mutual does not dispute Rite Aid's entitlement to post-judgment interest.  Accordingly, Rite Aid shall be awarded post-judgment interest in accordance with 28 U.S.C. § 1961(a).

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RITE AID CORPORATION,** | : | |
| | : | **CIVIL ACTION NO. 1:CV-03-1801** |
| **Plaintiff** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| | : | |
| **LIBERTY MUTUAL FIRE** | : | |
| **INSURANCE CO., et al.,** | : | |
| | : | |
| **Defendants** | : | |

**ORDER AND JUDGMENT**

**AND NOW**, this 14th day of August, 2006, **IT IS HEREBY ORDERED THAT**

Defendant Liberty Mutual Insurance Co. **SHALL PAY** Plaintiff Rite Aid Corp. One Million

Dollars ($1,000,000.00) in damages on Count I of the Complaint, plus Two Hundred Eighty-

Four Thousand, Four Hundred and Ninety-Four Dollars and Two Cents ($284,494.02) in pre-

judgment interest, plus post-judgment interest in accordance with 28 U.S.C. § 1961(a).  The

Clerk of Court is directed to close the file.


                                                S/ Yvette Kane
                                              Yvette Kane
                                              United States District Judge


Dated: August 14, 2006